# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                Case No. 07-CR-202

KENNETH ROBINSON, JR.,

        Defendant.

## MAGISTRATE JUDGE'S RECOMMENDATION TO THE HONORABLE LYNN ADELMAN

## NATURE OF CASE

On July 24, 2007, a federal grand jury sitting in this district returned a two-count indictment against defendant Kenneth Robinson, Jr. The defendant is charged in Count One with being a convicted felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Count Two charges the defendant with possessing ammunition as a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

On September 14, 2007, the defendant appeared before this court for arraignment and entered a plea of not guilty. Pursuant to the pretrial scheduling order issued at that time, the defendant has filed a motion to suppress physical evidence and all statements. (Docket #10). This motion will be addressed herein. In his motion, the defendant is challenging the legality of the stop on May 22, 2007, and his statement to Milwaukee Police Officer Patrick Pajot on May 22, 2007. Specifically, the defendant challenges the officer's alleged failure to honor his right to remain silent and his right to counsel.

## MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS

On November 1, 2007, the court conducted an evidentiary hearing on the defendant's motion to suppress evidence and statements. Milwaukee Police Department (MPD) Officers Rodolfo Gomez, Thomas Obregon and Patrick Pajot testified on behalf of the government. Based on the testimony at the hearing and the stipulation of the parties, the court makes the following findings of fact.

## Findings of Fact

On May 22, 2007, at approximately 2243 hours (10:43 p.m.), Milwaukee Police Department Officers Thomas Obregon and Rodolfo Gomez were on patrol in the 2300 block of N. 44th Street in Milwaukee, Wisconsin. The officers, who were dressed in police uniform and were traveling in a marked squad car, were assigned to the Neighborhood Safety Initiative, a direct patrol mission for high crime areas in the city.

Officers Obregon and Gomez observed the defendant, Kenneth Robinson, along with two other individuals, in front of the residence at 2343 N. 44th Street in Milwaukee, Wisconsin. As the officers approached the three individuals in their marked squad, the three individuals walked toward the gangway adjacent to the home at 2343 N. 44th Street at a fast pace. The gangway, the sidewalk between the two houses, was a dark area. The officers could see the shadows of the three individuals as they drove past the house in their squad car. The area is a high crime area with crimes such as armed robberies, shootings, drug dealing and homicides occurring in that neighborhood.

Approximately five minutes later, the officers returned to the 2300 block of N. 44th Street and observed the defendant on the sidewalk in front of the house at 2343 N. 44th Street.

Officer Obregon, who was driving, pulled the squad car over so that the officers could conduct a field interview. They observed one person seated on the steps in front of the house and the other person standing next to him. The defendant was on the sidewalk.

The officers exited their squad car. As they did so, the defendant started walking at a fast pace up the stairs to the front door at 2343 N. 44th Street. Officer Gomez identified himself and told the defendant to stop. The defendant then ran up the porch steps toward the entry to the house and began pounding on the door with his foot to gain entry. Officer Gomez ordered the defendant to stop and put his hands up.

Officer Gomez ran up the stairs in pursuit of the defendant and attempted to take control of him. Officer Gomez observed the defendant begin to remove a black handgun from his pants. Officer Gomez disengaged from the defendant and drew his firearm. He shouted that the defendant had a gun. The defendant ran down the porch steps and was tackled by Officer Obregon.

Officers Obregon and Gomez struggled with the defendant. The defendant was arrested. A firearm, described as a HiPoint .380 caliber semi automatic pistol with serial number P7649892, and a magazine for that firearm containing six unspent rounds of .380 caliber ammunition were recovered in the area where the struggle with the defendant occurred. The defendant was searched after his arrest and a .380 caliber bullet was recovered from his pants pocket. After his arrest, the defendant told the officers that he resided at 2343 N. 44th Street.

On May 23, 2007, the defendant was interviewed by MPD Officer Patrick Pajot in a fifth floor interview room at the Police Administration Building. The interview began at approximately 2:35 a.m. and lasted about 45 minutes. The defendant was not handcuffed

or threatened in any way during the interview. The defendant was given his Miranda[1] rights by Officer Pagot. After Officer Pajot read the defendant his rights, the following exchange occurred:[2]

| | |
|---|---|
| Officer: | Okay, Realizing those rights, are you willing to make a statement? |
| Defendant: | No. |
| Officer: | Okay. Do you wanna answer any questions like your pedigree, your mom, your dad. |
| Defendant: | Yeah, I'm hurt. I'm hurt, my leg hurts like a motherfucker. My leg hurt. I want pictures of my legs man. |
| Officer: | Okay, okay. |
| Defendant: | Would you please put that on your recording man. Unintelligible. |
| Officer: | You wanna, you wanna talk about this gun incident tonight? |
| Defendant: | No, (unintelligible) my legs (unintelligible). |
| Officer: | Listen Kenny, I wasn't out there um. . .um. . .and oh okay I realize that and you have that right that you don't need to make a statement and that's fine with me. Um. . .the officer's that arrested you said you've got something else going on in court tomorrow. Correct? |
| Defendant: | Uh, huh. |
| Officer: | Okay. Well we're gonna get you back in your cell so we can getcha back to county so you can go to your court case tomorrow. Okay? |
| Defendant: | Uh, huh. |
| Officer: | Okay. |
| Defendant: | Unintelligible, bail. |

---

[1]Miranda v. Arizona, 384 U.S. 436 (1966).

[2]The defendant's statement was recorded and the compact disc (Government Exh. #2) details the statement provided by the defendant to Officer Pajot on May 23, 2007.

| | |
|---|---|
| Officer: | What's that? |
| Defendant: | Bail going to be set tonight? |
| Officer: | I don't know about tonight. It might be set in the morning. But a Ken, if you decide to change your mind, I'm going to be around a little bit longer tonight. My name's Officer Pajot. Okay. You can ask the guys over in the jail to come get me and I'll come back over. |
| Defendant: | Unintelligible. |
| Officer: | Unintelligible. And I'll talk to ya. Okay. |
| Defendant: | What they get me for, bailjumping charge? |
| Officer: | Yeah. |
| Defendant: | That's what it is. |
| Officer: | The charges they wrote you up for at this time looks like a bailjumping, a fipof, CCW-gun, resist/obstruct, and then they're talking about some other kind of, some stuff that they thought you were gonna pull a gun on a cop or something. That's all up in the air still. That's the charges that they're (unintelligible) what they put down for you. |
| Defendant: | Bailjumping, Carrying a concealed weapon. |
| Officer: | Felon in possession of a firearm and resist/obstruct officer. So, a couple of felonies, a couple of misdemeanors. Uh, but like I said if you change your mind, Ken, you wanna talk to me about this, feel free to let the bookers know over there and they'll come get me, okay? |
| Defendant: | What's your name? |
| Officer: | My name's Pajot. Okay (unintelligible) let me uh... |
| Defendant: | What if I tell. |
| Officer: | What's that? |
| Defendant: | What if I tell (unintelligible). |
| Officer: | What's that? |

| | |
|---|---|
| Defendant: | What if I tell (unintelligible). |
| Officer: | Oh, you're talking about trying to work this off? |
| Defendant: | Hell, yeah. |
| Officer: | The only problem Ken is we can do something like that. |
| Defendant: | I gotta lot...(unintelligible). |
| Officer: | But listen. Here's the thing. I know you already talked, you already talked about gun lawyer and that kinda stuff but what the best thing to do is when you got that court case tomorrow and I don't know, what is that a jury trial? How's that working out? |
| Defendant: | They deliberating. The jury deliberating right now. |
| Officer: | So it's already done? Okay. |
| Defendant: | Yeah, the case is closed. |
| Officer: | (Unintelligible) Okay. Well this is what we can do. Who's your lawyer? |
| Defendant: | Rick Steinberg. |
| Officer: | Steinberg. |
| Defendant: | Yeah. |
| Officer: | Well we can talk to Rick tomorrow, at a [sic] court tomorrow. We can tell him, you know, you're interested in trying to do something with this case, but if you want to do something to try to work this case off. |
| Defendant: | Unintelligible, What if I tell you I can get you about half a key of (unintelligible). |
| Officer: | I hear ya Ken but the thing is before in order to do that we gotta come clean about what happened tonight. You know what I'm saying? I can't just let you run out there and do something when you're not even telling me whatever happened today. You know, I wasn't there. I was up here so I don't even know what happened. |
| Defendant: | Unintelligible. I tried to tell the truth. |

| | |
|---|---|
| Officer: | Okay well. That wasn't to me though. You know what I'm saying. |
| Defendant: | Unintelligible. I mean I honestly told you the truth man. |
| Officer: | What, what happened...well you tell me the truth, I wasn't in here. |
| Defendant: | I'm telling you the truth, man. That other guy (unintelligible) a gun. He threw the gun man. I tried to help him get into the house. I couldn't get into the house. He ran. The police dragged me down and put the gun on me man. |

## Analysis

The defendant asserts that the officers did not have reasonable suspicion to stop him outside the residence at 2343 N. 4th Street. He further asserts that Officer Pajot violated his rights when he continued to question him after the defendant stated that he did want to answer questions about the crime.

The government maintains that a seizure does not occur merely because a police officer approaches a person to ask questions. The government further asserts that no reasonable suspicion was required for the officers to approach and question the defendant, but that the defendant's flight from the officers when they exited their squad car in the high crime area supports a finding of reasonable suspicion. The government also states that after the defendant was Mirandized and indicated that he did not want to answer questions, he initiated further communication with Office Pajot.

Not every encounter with a law enforcement office is a seizure withing the meaning of the Fourth Amendment. United States v. Adamson, 441 F.3d 513, 519-20 (7th Cir. 2006). A seizure does not occur merely because a police officer approaches a person and asks a few questions. Florida v. Bostick, 501 U.S. 429, 434 (1991). As the Court explained: "mere police questioning does not constitute a seizure." Id. Thus, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another

- 7 -
Case 2:07-cr-00202-LA   Filed 12/07/07   Page 7 of 13   Document 24

public place, by asking him if the is willing to answer some questions [or] by putting questions to him if the person is willing to listen." Id. (quoting Florida v. Royer, 460 U.S. 491, 497 [1983]).

In United States v. Burton, 441 F.3d 509, 511 (7th Cir. 2006), cert. denied, ___ U.S. ___, 127 S.Ct. 1276 (2007); the court stated:

> Even though "approaching a person on the street (or at work, or on a bus) to ask him a question causes him to stop for at least the time needed to hear the question and answer (or refuse to answer)," United States v. Childs, 277 F.3d 947, 950 (7th Cir. 2002) (en banc), the curtailment of the bystander's mobility, privacy, and peace of mind is so slight that neither probable cause nor reasonable suspicion is required to justify the police action. No suspicion at all is required in such a case . . ..

(other citations omitted). "The encounter will not trigger Fourth Amendment scrutiny until it loses its consensual nature." Bostick, 501 U.S. at 434

However, a person's flight upon seeing law enforcement officers approach in a high crime area establishes reasonable suspicion to justify a Terry[3] stop. Illinois v. Wardlow, 528 U.S. 119, 124 (2000). In Wardlow, the defendant fled upon seeing a four-car caravan of police officers converging on an area known for heavy narcotics trafficking. One of the officers caught up with the defendant, stopped him and conducted a protective pat-down search for weapons. The Court acknowledged that a person's presence in a high crime area, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. Id. (citing Brown v. Texas, 443 U.S. 47 [1979]). However, the Court stated that "officers are not required to ignore relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Id.

---

[3] Terry v. Ohio, 392 U.S. 1, 21 & 30 (1968).

Noting that the defendant's unprovoked flight aroused the officers' suspicion, the Court stated: "Our cases have also stated that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." Id. (citations omitted). "Headlong flight – wherever it occurs – is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Id. As the Court explained,

> [U]nprovoked flight is simply not a refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or stay put and remain silent in the fact of police questioning.

Id at 125; see also, United States v. Lawshea, 461 F.3d 857, 859 (7th Cir. 2006).

Contrary to the defendant's contentions, the facts in the instant case are similar to those in Wardlow. In both cases, the defendants were present in a high crime area and fled from officers who appeared on the scene. Here, the officers, who were in uniform and in a marked squad car, observed the defendant and two other persons, who were in front of the residence at 2343 N. 44th Street, move at a fast pace toward the dark gangway next to the home. The officers returned a short time late and pulled the squad car over so that they could conduct a field interview. As the officers exited the car, the defendant, who was now standing on the sidewalk, started walking at a face pace up the front stairs of the house. When office Gomez identified himself and told the defendant to stop, the defendant ran up the steps and began kicking the door to gain entry. The defendant's presence in a high crime area, coupled with his flight from the police officers, gave the officers reasonable suspicion to pursue the defendant and conduct a Terry stop. Wardlow, 528 U.S. at 123-26; Lawshea, 461 F.3d at 859-60. Moreover, the defendant's failure to stop when ordered to do so heightened the officers' reasonable suspicion. See Lawshea, 461 F.3d at 860; see also United States v. Lenoir, 318 F.3d 725,729 (7th Cir. 2003).

The defendant also maintains that the police continued to question him after he was given his Miranda warnings and stated that he did not want to answer questions. Although the defendant states in his motion that his right to counsel was violated, he presents no argument addressing this contention. Moreover, the transcript of the recorded conversation contains no indication that the defendant asserted his right to counsel. In response to the defendant's motion, the government does not dispute that the defendant responded that he did not want to answer questions after being advised of his rights. However, the government asserts that the defendant initiated further conversation with the police after initially declining to answer any questions.

The Fifth Amendment privilege against self-incrimination and the right to counsel require police to follow certain procedural safeguards during custodial interrogations of a suspect. Miranda v. Arizona, 384 U.S. 436 (1966). In Michigan v. Mosley, 423 U.S. 96 (1975), the Supreme Court rejected the proposition that its earlier decision in Miranda barred law enforcement officials from ever questioning a suspect after the suspect had invoked his right to remain silent. Rather than adopt such a per se rule, the Mosley court laid down an approach which considers the concerns of the Miranda court on a case-by-case basis. The court reasoned that to absolutely prohibit all questions after a defendant's invocation of the right to silence would be "irrational" and would frustrate the police's "legitimate . . . investigative activity." Mosley, 423 U.S. at 102. Rather, the Court concluded that "the admissibility of statements obtained after the person in custody decided to remain silent depends under Miranda on whether 'his 'right to cut off questioning' was 'scrupulously honored.'" Id. at 104.

Miranda safeguards apply to custodial police interrogations of a subject. Interrogation includes "express questioning," as well as "any words or actions on the part of the police

(other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). Under the court of appeals for this circuit's interpretation of Innis, the test is "whether an objective observer would have believed that the . . . questions claimed by (the defendant) to have been unlawful interrogation were in fact 'reasonably likely to elicit' an incriminating response." United States v. Abdulla, 294 F.3d 830, 834 (7th Cir. 2002) (quoting United States v. Westbrook, 125 F.3d 996, 1002 [7th Cir. 1997] [citations omitted]). However, voluntary statements made after a defendant invokes his Fifth Amendment rights are not subject to suppression if "the accused himself initiates further communication, exchanges, or conversations with police." Edwards v. Arizona, 451 U.S. 477, 485 (1981). Thus, a defendant's voluntary statements made after he invoked his right to remain silent need not be suppressed if they were not made in response to police questioning.

In this case, Officer Pajot read the defendant his Miranda rights and then asked the defendant if, realizing those rights, he was willing to make a statement. The defendant responded, "no." The defendant was asked if he wanted to answer pedigree questions, including questions about his mom and dad. His response was "Yeah, I'm hurt, I'm hurt . . . . " Given this less than clear cut response, the officer asked the defendant if he was willing to talk about the gun incident. The defendant said "no." The officer's question did not constitute interrogation since it was not reasonably likely to elicit an incriminating response. Innis, 446 U.S. at 300-01; Abdulla, 294 F.3d at 834.

Thereafter, the officer told the defendant that he would be taken back to his cell so he would be able to go to his court case in the morning. The defendant initiated further conversation by asking the officer if bail was going to be set that night. Officer Pajot said he

did not know, but he gave the defendant his name and said he would be available awhile longer if the defendant changed his mind.

Again, the defendant initiated further conversation by asking Officer Pajot whether they got him on a bail-jumping charge. The officer said "yes" and explained the pending charges to the defendant. Providing a defendant with information about the charges he faces upon arrest, even after a defendant invokes his right to remain silent, is proper. See Easley v. Frey, 433 F.3d 969, 974 (7th Cir. 2006).

The defendant then asked the officer his name and inquired about working off the charges. Officer Pajot told the defendant that they could talk to the defendant's attorney at court in the morning and tell the attorney that the defendant was interested in trying to work off these charges. The defendant then asked another question and eventually began discussing the gun offense and his involvement.

To determine whether the police have breached their duty to honor a suspect's right to remain silent, a court must consider the totality of the circumstances. See Mosley, 423 U.S. at 104-05; Easley, 433 F.3d at 972. Here, a review of the entirety of the conversation between Officer Pajot and the defendant reveals that the defendant voluntarily initiated further conversation with the officer. Officer Pajot did not interrogate the defendant after the defendant invoked his right to remain silent. Nor can the court conclude that Officer Pajot should have known that his comments were "reasonably likely to elicit an incriminating response" from the defendant. Innis, 446 U.S. at 301. Therefore, considering the totality of the circumstances, the court concludes that the defendant's statement to Officer Pajot is not subject to suppression.

Accordingly, for the reasons stated herein, the court will recommend to United States District Judge Lynn Adelman that the defendant's motion to suppress be denied.

- 12 -
Case 2:07-cr-00202-LA    Filed 12/07/07    Page 12 of 13    Document 24

## **CONCLUSION**

**NOW, THEREFORE, IT IS HEREBY RECOMMENDED** that the United States district judge enter an order **denying** defendant Robinson's motion to suppress physical evidence and statements. (Docket #10).

Your attention is directed to 28 U.S.C. § 636(b)(1)(A) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin, this 7th day of December, 2007.

BY THE COURT:

s/Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge