**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**UNITED STATES OF AMERICA**
        **Plaintiff,**

    v.                                                  **Case No. 07-CR-202**

**KENNETH ROBINSON**
        **Defendant.**

---

## DECISION AND ORDER

The government charged defendant Kenneth Robinson with possession of a firearm and ammunition as a felon, contrary to 18 U.S.C. § 922(g). Defendant moved to suppress the firearm and ammunition seized from his person and a post-arrest statement he made to law enforcement. The magistrate judge handling pre-trial matters in the case held a hearing, then recommended that the motion be denied. Defendant objects, requiring me to review the matter de novo. Fed. R. Crim. P. 59(b)(3).[1]

### I. FACTS

On May 22, 2003, at about 22:43, Milwaukee Police Officers Thomas Obregon and Rodolfo Gomez, while on patrol in a marked squad car in the 2300 block of North 44th Street as part of a Neighborhood Safety Initiative,[2] observed three individuals in front of 2343 N. 44th

---

[1]Defendant does not request a de novo hearing. Therefore, I will rely on the record made before the magistrate judge. The parties stipulated to certain facts surrounding defendant's arrest (R. 16), and the government offered additional testimony on certain points at the hearing. Defendant's post-arrest statement was recorded, and the magistrate judge received an audio CD and transcript of the statement. (Govt.'s Ex. 1 & 2.)

[2]Gomez testified that the Neighborhood Safety Initiative ("NSI") was a direct patrol mission for high crime areas in the City of Milwaukee. (11/1/07 Evid. Hr'g Tr. at 7.) Gomez further testified that the area of 2300 N. 44th Street was a high crime area, and that he was

Street. (Stipulation of Facts [R. 16] at 1; 11/1/07 Evid. Hr'g Tr. at 10.) Gomez testified that as they approached, the three individuals walked toward the gangway between two houses at a fast pace. (Tr. at 10-11.) The officers traveled past the three individuals and observed their shadows in the gangway. (Id. at 11.)

A few minutes later, the officers returned to the area and saw one individual (later identified as defendant) on the sidewalk and the other two individuals on the porch steps in front of 2343 N. 44th Street. (Id. at 12-13.) The officers pulled up in front of 2343 N. 44th Street and exited their squad to conduct a field interview. As they did so, defendant walked towards the house at a fast face. Gomez said, "stop, police," but defendant started running up the porch steps towards the house. (R. 16 at 1-2; Tr. at 14-15, 34.) Gomez again yelled, "stop," and ran up the steps after defendant. Defendant tried to enter the house, which appeared to be locked, kicking at the door with his foot to gain entry. (R. 16 at 2; Tr. at 15.) Gomez approached defendant and grabbed his arm to try to turn him around. (Tr. at 16.) Defendant struggled, and Gomez observed defendant reach into his right front pants pocket to retrieve a firearm. (R. 16 at 2; Tr. at 17.) Gomez then disengaged from defendant and drew his own firearm. Defendant ran down the porch steps, and Officer Obregon tackled him. Gomez shouted that defendant had a gun and, after a struggle, the officers placed defendant under arrest. The officers found a .380 caliber pistol in the area of the struggle and, on a subsequent search of defendant's person, recovered a .380 caliber bullet from defendant's

---

advised of violent crimes in the area such as armed robberies, shootings and drug dealing. (Id. at 9.) Officer Obregon testified that he worked in the district for about seven years, and that shootings, robberies, narcotics trafficking and batteries occurred there. (Id. at 30-31.) Obregon further testified that pursuant to the NSI officers were assigned to those specific areas where crime was highest based on crime analysis statistics. (Id. at 32.) He stated that the 2300 block of N. 44th Street was a target of the NSI. (Id. at 32.)

pants pocket.³  (R. 16 at 2.)

Following the arrest, Milwaukee Police Officer Patrick Pajot interviewed defendant in an interview room containing a cement table, wooden bench and one or two chairs at the police administration building. (Id. at 38-39.) The interview began at about 2:35 a.m. and lasted approximately forty-five minutes. Aside from a brief entry by a person who delivered a picture to Pajot, defendant and Pajot were the only people in the room. Defendant was not handcuffed. (Id. at 39-40.)

According to the transcript of the recorded interview, Pajot read defendant his Miranda rights, and defendant indicated that he understood. (Govt.'s Ex. 1 at 1-2.) The following exchange then occurred:

> Officer: Okay, Realizing those rights, are you willing to make a statement?
>
> Defendant: No.
>
> Officer: Okay. Do you wanna answer any questions like your pedigree, your mom, your dad.
>
> Defendant: Yeah, I'm hurt. I'm hurt, my leg hurts like a motherfucker. My leg hurt. I want pictures of my legs man.
>
> Officer: Okay, okay.
>
> Defendant: Would you please put that on your recording man. Unintelligible.
>
> Officer: You wanna, you wanna talk about this gun incident tonight?
>
> Defendant: No, (unintelligible) my legs (unintelligible).
>
> Officer: Listen Kenny, I wasn't out there um. . .um. . .and oh okay I realize that and you have that right that you don't need to make a statement and that's fine with me. Um. . .the officer's that

---

³Defendant later advised officers that he lived at 2343 N. 44th Street (Id. at 23), but Gomez did not know that at the time of the stop (Id. at 16).

3

arrested you said you've got something else going on in court tomorrow. Correct?

Defendant: Uh, huh.

Officer: Okay. Well we're gonna get you back in your cell so we can getcha back to county so you can go to your court case tomorrow. Okay?

Defendant: Uh, huh.

Officer: Okay.

Defendant: Unintelligible, bail.

Officer: What's that?

Defendant: Bail going to be set tonight?

Officer: I don't know about tonight. It might be set in the morning. But a Ken, if you decide to change your mind, I'm going to be around a little bit longer tonight. My name's Officer Pajot. Okay. You can ask the guys over in the jail to come get me and I'll come back over.

Defendant: Unintelligible.

Officer: Unintelligible. And I'll talk to ya. Okay.

Defendant: What they get me for, bailjumping charge?

Officer: Yeah.

Defendant: That's what it is.

Officer: The charges they wrote you up for at this time looks like a bailjumping, a fipof, CCW-gun, resist/obstruct, and then they're talking about some other kind of, some stuff that they thought you were gonna pull a gun on a cop or something. That's all up in the air still. That's the charges that they're (unintelligible) what they put down for you.

Defendant: Bailjumping, Carrying a concealed weapon.

Officer: Felon in possession of a firearm and resist/obstruct officer. So,

4

a couple of felonies, a couple of misdemeanors. Uh, but like I said if you change your mind, Ken, you wanna talk to me about this, feel free to let the bookers know over there and they'll come get me, okay?

Defendant: What's your name?

Officer: My name's Pajot. Okay (unintelligible) let me uh...

Defendant: What if I tell.

Officer: What's that?

Defendant: What if I tell (unintelligible).

Officer: What's that?

Defendant: What if I tell (unintelligible).

Officer: Oh, you're talking about trying to work this off?

Defendant: Hell, yeah.

Officer: The only problem Ken is we can do something like that.

Defendant: I gotta lot...(unintelligible).

Officer: But listen. Here's the thing. I know you already talked, you already talked about gun lawyer and that kinda stuff but what the best thing to do is when you got that court case tomorrow and I don't know, what is that a jury trial? How's that working out?

Defendant: They deliberating. The jury deliberating right now.

Officer: So it's already done? Okay.

Defendant: Yeah, the case is closed.

Officer: (Unintelligible) Okay. Well this is what we can do. Who's your lawyer?

Defendant: Rick Steinberg.

Officer: Steinberg.

5

Defendant: Yeah.

Officer: Well we can talk to Rick tomorrow, at a [sic] court tomorrow. We can tell him, you know, you're interested in trying to do something with this case, but if you want to do something to try to work this case off.

Defendant: Unintelligible, What if I tell you I can get you about half a key of (unintelligible).

Officer: I hear ya Ken but the thing is before in order to do that we gotta come clean about what happened tonight. You know what I'm saying? I can't just let you run out there and do something when you're not even telling me whatever happened today. You know, I wasn't there. I was up here so I don't even know what happened.

Defendant: Unintelligible. I tried to tell the truth.

Officer: Okay well. That wasn't to me though. You know what I'm saying.

Defendant: Unintelligible. I mean I honestly told you the truth man.

Officer: What, what happened...well you tell me the truth, I wasn't in here.

Defendant: I'm telling you the truth, man. That other guy (unintelligible) a gun. He threw the gun man. I tried to help him get into the house. I couldn't get into the house. He ran. The police dragged me down and put the gun on me man.

Officer: Okay well. And I wasn't there, you know what I'm saying. What I'm being told is that you had a gun in your pocket.

Defendant: No, that's not true man.

Officer: And that you tried to get up into a house up over on a . . .

Defendant: I was trying to get into a house for my guy (unintelligible)

(Govt.'s Ex. 1 at 2-6.)[4]

---

[4]Defendant proceeded to make a statement in which he indicated, in part, that the gun officers attributed to him had been thrown down by another individual, who then ran off. (Id. at 7-13.)

## II.  DISCUSSION

Defendant argues that Officers Gomez and Obregon violated his Fourth Amendment rights when they seized him, and Officer Pajot violated his Fifth Amendment rights under Miranda by continuing to question him after he invoked his right to remain silent.  I analyze each issue in turn.

**A.     The Seizure**

The Seventh Circuit has identified three types of citizen-police encounters.  United States v. Felix-Felix, 275 F.3d 627, 632-33 (7th Cir. 2001), superseded on other grounds by statute as recognized in United States v. Rodriguez-Cardenas, 362 F.3d 958 (7th Cir. 2004).  The first is a consensual encounter, which involves no restraint on a subject's liberty and is characterized by non-coercive police questioning of a citizen in a public place.  This type of encounter is not a seizure within the meaning of the Fourth Amendment and requires no objective justification.  See, e.g., Florida v. Bostick, 501 U.S. 429, 434 (1991); United States v. Burton, 441 F.3d 509, 511 (7th Cir. 2006), cert. denied, 127 S. Ct. 1276 (2007).

The second type of encounter is an investigatory or Terry stop, see Terry v. Ohio, 392 U.S. 1 (1968), which consists of a brief, non-intrusive detention, during which an officer will ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's reasonable suspicion that criminal activity is afoot.  See Berkemer v. McCarty, 468 U.S. 420, 439 (1984).  In order to justify a Terry stop, the officer must have specific and articulable facts which, taken together with the rational inferences drawn from them, reasonably warrant the intrusion.  United States v. Rivers, 121 F.3d 1043, 1045 (7th Cir. 1997).  Reasonable suspicion is a quantum of proof less demanding

7

than the probable cause needed for arrest, but it must be more than an inchoate suspicion or hunch. United States v. Ienco, 182 F.3d 517, 523 (7th Cir. 1999). The court considers the totality of the circumstances in deciding whether the officer had reasonable suspicion, including the experience of the officer, the behavior of the defendant and the location of the encounter. United States v. Baskin, 401 F.3d 788, 791-92 (7th Cir. 2005). Once the police have the reasonable suspicion required to justify an investigatory stop, they may use reasonable means to effectuate that stop, including a measured use of force. United States v. Lawshea, 461 F.3d 857, 860 (7th Cir. 2006). Further, an officer may, as part of a Terry stop, conduct a non-invasive pat-down if he has reason to believe that the person he is dealing with is armed and dangerous. Rivers, 121 F.3d at 1045. In order to justify a pat-down, the officer must "be able to point to specific and articulable facts indicating that the individual may be armed and present a risk of harm to the officer or to others." United States v. Brown, 188 F.3d 860, 864 (7th Cir. 1999).

The third type of encounter occurs when the police action exceeds a short detainment. The seizure then becomes a full-blown arrest, for which the police are required to have probable cause to believe that a person has committed or is committing a crime. See Felix-Felix, 275 F.3d at 633 (citing Beck v. Ohio, 379 U.S. 89, 96-97 (1964)).

Under these standards, Officers Gomez and Obregon did not violate defendant's Fourth Amendment rights. First, while defendant's mere presence on the sidewalk in the 2300 block of North 44th Street – a high crime area – did not provide the officers grounds to seize him, the officers needed no justification to simply approach him to conduct a field interview. See, e.g., United States v. Breland, 356 F.3d 787, 791 (7th Cir. 2004) ("[W]hen Officer Luecke initially addressed Breland while Breland was on or near his front porch by saying 'Police, I want to talk

8

to you,' Breland was not seized; if anything, Officer Luecke was attempting to engage in a consensual encounter [but] Breland immediately started to run[.]").

Second, defendant's flight upon the officers' approach, his refusal to obey Gomez's commands to stop, and his apparent attempt to get into the house by kicking the door provided the officers with grounds to conduct a stop.[5] See Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000) (holding that flight in a high crime area provides reasonable suspicion for a Terry stop); Lawshea, 461 F.3d at 859-60 (holding that flight in a high crime area and refusal to obey commands justified a stop); Breland, 356 F.3d at 791 ("Once Breland fled from the police, the officers undoubtedly had reasonable suspicion to pursue Breland in order to conduct a Terry stop."); United States v. Lenoir, 318 F.3d 725, 729-30 (7th Cir. 2003) (finding reasonable suspicion for stop where the defendant fled in a high crime area and entered a home the officers did not, at the time of the stop, know was his).

Finally, it was reasonable for the officers to subdue and take defendant into custody after he struggled with Gomez and reached for a gun. See United States v. Seymour, 472 F.3d 969, 971 (7th Cir.), cert. denied, 127 S. Ct. 3022 (2007) ("There can be no doubt that the officer was entitled, upon seeing the defendant get out of a car that had been reported stolen, to approach him to ask questions – indeed a police officer doesn't need even bare suspicion simply to approach a person and ask a question of him, Florida v. Royer, 460 U.S. 491, 497 (1983); United States v. Childs, 277 F.3d 947, 950 (7th Cir. 2002) (en banc) – and to chase him when he ran away at the officer's approach and to seek to subdue him when he resisted being

---

[5]Although defendant later told officers that he lived at 2343 N. 44th Street, Gomez did not have this information at the time of the stop. Thus, Gomez could reasonably suspect that defendant was trying to barge into someone's house by kicking the door.

9

stopped, and then search him, including his clothes, including the abandoned sweatshirt."); Breland, 356 F.3d at 791 ("Finally, after Breland threw the bag of drugs over the fence, and charged Officer Luecke with a firearm in his hand, the police had probable cause to arrest him and search his person.").

In his objections, defendant argues that the magistrate judge made too much of the character of the neighborhood in which the encounter occurred. He notes that Officer Obregon admitted that not every house and every person on that block was involved in criminality. (Tr. at 35.) However, defendant cites no authority for the proposition that such a showing is necessary under Terry and its progeny.[6]

Defendant next argues that the magistrate judge improperly found that his initial interaction with the officers did not constitute a seizure. He contends that he chose not to speak to the officers and tried to leave, but they did not let him. However, defendant did more than attempt to leave; he ran up the stairs towards the house and tried to gain entry by kicking the door. See Wardlow, 528 U.S. at 125 ("Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning."). Further, the Seventh Circuit has made clear that a Fourth Amendment seizure does not occur if the defendant fails to comply with an officer's show of authority. See, e.g., United States v. $32,400.00 in United States Currency, 82 F.3d 135, 138 (7th Cir. 1996) (citing California v. Hodari D., 499 U.S. 621, 624-27 (1991)) ("If no physical force accompanied the show of

---

[6] As I discuss later, the government provided a sufficient factual basis for concluding that the 2300 block of N. 44th Street is a high crime area.

10

authority and a person chose to ignore or reject that show of authority, the defendant is not seized until the officer applied physical force and the person submitted to the officer's show of authority."). In the present case, Gomez applied no physical force before defendant ran towards the house and kicked the door. Therefore, the officers did not effect a seizure until they actually laid hands on defendant. See generally United States v. Harris, 313 F.3d 1228, 1234 (10th Cir. 2002).

Defendant next challenges the magistrate judge's conclusion that his flight provided reasonable suspicion. He contends that the problem with the magistrate judge's analysis stems from the blanket "high crime area" label applied by the officers and the absence of any specific criminal activity observations prior to their stopping their squad car. Defendant claims that to apply Wardlow to this case would allow police to create grounds for a stop whenever a citizen in a certain neighborhood declines to speak with them. The argument fails.

First, the government presented sufficient evidence that this area was, in fact, one of high crime. Specifically, Officer Obregon testified that he worked in the area for about seven years and was familiar with the serious crimes that occurred there. Obregon further testified that the NSI relied on crime statistics in assigning officers. Thus, this was not a case where the government relied on mere generalized assertions, which could "'easily serve as a proxy for race or ethnicity.'" (Def.'s Objections at 1, quoting United States v. Montero-Camargo, 208 F.3d 1122, 1138 (9th Cir. 2000).)

Second, the officers did not rely on defendant's mere presence in the area to justify the seizure; nor did they create the circumstances justifying it. The officers did not attempt to seize defendant until after he fled and attempted to enter the home by banging on the door with his foot. While a citizen can decline to speak to an officer and walk away, as indicated above, the

11

Supreme Court has held that flight is different. Wardlow, 528 U.S. at 125 ("Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite.").[7]

Therefore, for all of these reasons and those stated by the magistrate judge, defendant's motion to suppress physical evidence will be denied.

**B.  The Statement**

In order to protect the Fifth Amendment right against self-incrimination, a suspect subjected to custodial interrogation must be advised of his right to remain silent, his right to an attorney, and that any statement he makes may be used as evidence against him. United States v. James, 113 F.3d 721, 726 (7th Cir. 1997). The police must "scrupulously honor" a defendant's invocation of his right to remain silent. Michigan v. Mosley, 423 U.S. 96, 104 (1975). The issue in the present case is whether Pajot contravened this requirement after defendant initially stated that he did not want to answer any questions.[8] In making this determination, I consider the totality of the circumstances. See id. at 104-05.

The recorded statement, recounted above, reveals that Pajot attempted to honor defendant's invocation of his right to silence, but defendant kept on talking. After Pajot read defendant his rights, defendant stated that he did not want to make a statement. Pajot then

---

[7]Defendant states that many in the African-American community do not care to speak to the police, and that they should be allowed to refuse to do so; running or walking should not make a difference. (Def.'s Objections at 2.) The dissenters in Wardlow made similar arguments, 528 U.S. at 132-33 (Stevens, J., dissenting), but their views did not carry the day.

[8]Although defendant raised a Sixth Amendment right to counsel issue in his original motion, he has since abandoned it. He also does not press before me any argument that Pajot violated his Fifth Amendment right to counsel, and the record reveals that defendant did not assert such right. Finally, defendant does not contest the voluntariness of his statement or waiver. The sole issue before me is whether Pajot scrupulously honored defendant's initial invocation of the right to silence.

12

asked defendant if he would answer "pedigree," i.e. background questions. Such questions do not constitute interrogation under Miranda. See, e.g., Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990) (recognizing that Miranda does not apply to questions designed to secure the biographical data necessary to complete booking or pretrial services). Defendant responded that his leg hurt. Pajot then confirmed that defendant did not want to talk about that night's gun incident, stating that "you don't need to make a statement and that's fine with me." (Govt.'s Ex. 1 at 3.) Pajot stated that he would have defendant taken back to his cell, when defendant asked about bail and the nature of the charges. Pajot answered defendant's questions, which was permissible under Miranda. See Easley v. Frey, 433 F.3d 969, 974 (7th Cir. 2006) (stating that advising a suspect of the nature of the charges or the evidence does not constitute interrogation). Pajot then advised defendant that if he changed his mind, he could advise the booking officers. However, before Pajot could leave, defendant asked about cooperating with police to try to "work" the case off. Pajot advised defendant that officers could address that matter with defendant's lawyer tomorrow.[9] Because this was not a direct question and it was not likely to elicit an incriminating response, this statement also did not amount to interrogation. See Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

Defendant, apparently not wanting to let the matter wait until the next day, asked: "What if I tell you I can get you about half a key of (unintelligible)." (Govt.'s Ex. 1 at 5.) Pajot responded:

> I hear ya Ken but the thing is before in order to do that we gotta come clean

---

[9] Pajot was aware that defendant had a pending criminal case, and defendant advised Pajot of the name of his counsel in that case. As discussed above, defendant never invoked his Fifth Amendment right to counsel, and the Sixth Amendment right to counsel is offense specific. United States v. Krueger, 415 F.3d 766, 775 (7th Cir. 2005).

13

about what happened tonight. You know what I'm saying? I can't just let you run out there and do something when you're not even telling me whatever happened today. You know, I wasn't there. I was up here so I don't even know what happened.

(Id. at 5-6.) Defendant stated that he "tried to tell the truth," to which Pajot responded:

Officer [Pajot]: Okay well. That wasn't to me though. You know what I'm saying.

Defendant: Unintelligible. I mean I honestly told you the truth man.

Officer [Pajot]: What, what happened...well you tell me the truth, I wasn't in here [sic].

(Id. at 6.) The two then proceeded to discuss that night's incident.

Pajot's statements that defendant had to "come clean about what happened tonight" and "tell me the truth" were likely to elicit an incriminating response and thus amounted to interrogation.[10] The critical issue is whether, under all the circumstances, such statements evinced a failure to scrupulously honor defendant's previous invocation of his right to silence. Mosley advised that in making this determination, the court may consider the amount of time that lapsed between interrogations; the scope of the second interrogation; whether new Miranda warnings were given; and the degree to which police officers pursued further interrogation once the suspect had invoked his right to silence. Easley, 433 F.3d at 972-73 (citing United States v. Schwensow, 151 F.3d 650, 658 (7th Cir.1998)). None of these factors are predominant or dispositive, nor is the list exhaustive; rather, the court must focus on whether the confession was obtained in a manner compatible with the requirements of the Constitution. Id. at 973.

---

[10] I cannot agree with the government that Pajot was merely providing information on how defendant could work off the charges. (Govt.'s Resp. to Def.'s Objections at 3.) Pajot stated that in order to cooperate defendant had to first come clean about the incident that night.

14

Because this case does not involve serial interrogations, the first three Mosley factors are largely irrelevant. Rather, I will focus on the degree to which Pajot pursued further interrogation once defendant invoked his right to silence. Under the circumstances, I cannot conclude that Pajot failed to scrupulously honor defendant's rights. Pajot accepted defendant's initial invocation of his right to silence, stating "that's fine with me." (Govt.'s Ex 1 at 3.) He then tried to return defendant to his cell, but defendant asked about bail and the charges. After answering defendant's questions, Pajot again tried to end the interview, but defendant asked about cooperation. Pajot replied that the "best thing to do" would be to wait until tomorrow and raise the issue with defendant's lawyer. (Id. at 5.) Defendant again refused to wait and told Pajot he could get "about half a key." (Id.) It was only then that Pajot advised defendant that he had to come clean before he could (presumably) be released to engage in active cooperation, after which defendant began discussing the incident. In context, then, Pajot's post-invocation interrogation occurred only after he had thrice attempted to end the interview and return defendant to his cell. By that point, it was plain that defendant, in fact, wanted to talk. Miranda requires officers to advise defendants of their rights; it does not require them to try to talk a defendant out of making statement. See United States v. Rutledge, 900 F.2d 1127, 1130 (7th Cir. 1990) (stating, in a case in which the defendant made a custodial statement after asking about cooperation, that the "government was not required to tell him that if he was wise he would shut up"); see also United States v. Mills, 122 F.3d 346, 351 (7th Cir. 1997) (stating that a defendant may waive his right to silence by a course of conduct reflecting a desire to give up such right).

Thus, for all of these reasons and those stated by the magistrate judge, the motion to

suppress statements will be denied.[11]

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 24) is **ADOPTED**, and defendant's motion to suppress (R. 10) is **DENIED**.

**IT IS FURTHER ORDERED** that the **STATUS** originally scheduled for January 15, 2008, will be held on **Monday, January 14, 2008, at 11:00 a.m.**

Dated at Milwaukee, Wisconsin, this 9th day of January, 2008.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

---

[11]Defendant claims that the magistrate judge incorrectly applied the test found in Edwards v. Arizona, 451 U.S. 477 (1981). She committed no error in this regard. First, contrary to defendant's suggestion, Edwards was a Fifth Amendment/Miranda case, not a Sixth Amendment right to counsel case. It is true that Edwards addressed the Fifth Amendment/Miranda right to counsel, not the right to silence at issue here. However, the magistrate judge merely cited Edwards at one point; in the conclusion of her decision, she applied the appropriate totality of the circumstances test from Mosely. (Recommendation at 12.) Further, to the extent that Mosely directs the court to consider the degree to which police pursued further interrogation, the defendant's initiation of further communication is surely relevant.

16